IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 7, 2016 Session

## DAVID BRYAN HAWK v. CRYSTAL GOAN HAWK

**Appeal from the Chancery Court for Greene County**
**No. 20120191      Hon. E.G. Moody, Chancellor[1]**

---

**No. E2015-01333-COA-R3-CV-FILED-MARCH 9, 2016**

---

This post-divorce appeal concerns the mother's petition to modify the residential schedule in an agreed parenting plan. Following a hearing, the trial court found that a material change in circumstances had occurred that necessitated a change in the plan. The court modified the plan by order and further required the parties to attend parenting classes and mediation before seeking further relief from the court. The mother appeals. We affirm the court's modification of the plan. We reverse the requirement imposed upon the parties to attend parenting classes before seeking further relief from the court. We remand for entry of a permanent parenting plan and child support worksheet.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, C.J., joined.

Thomas C. Jessee, Johnson City, Tennessee, for the appellant, Crystal Goan Hawk.

Lois B. Shults-Davis, Erwin, Tennessee, for the appellee, David Bryan Hawk.

## OPINION

### I.      BACKGROUND

Crystal Goan Hawk ("Mother") and David Bryan Hawk ("Father") were married on November 15, 2009. This was the third marriage for Father and the second for Mother. One child, a girl ("the Child"), was born of the marriage. Father had one child ("Daughter") from a prior marriage. Throughout the majority of the marriage, Mother

---

[1] Sitting by Supreme Court designation.

operated her own law firm, while Father was employed by the State of Tennessee as a state representative for Greene County. Father's employment required his prolonged absence when the legislature was in session in Nashville.

At some point, Mother and Father ("the Parties") engaged in a physical altercation. As a result of the altercation, Father's visitation with the Child was severely limited. Father later filed a complaint for divorce, alleging inappropriate marital conduct and irreconcilable differences as statutory grounds. Mother responded with a counter-complaint for divorce, raising the same statutory grounds. The Parties were divorced by order on September 11, 2013. Father was later convicted of reckless endangerment, a misdemeanor, for his involvement in the altercation with Mother. His right to visitation was gradually reinstated.

Meanwhile, Father filed a motion to require Mother to complete a psychological examination. He also sought to disqualify her counsel, Thomas C. Jessee ("Counsel") because Counsel had entered into a romantic relationship with Mother.[2] An agreed parenting plan was entered on December 2, 2013. Pursuant to the plan, the Parties shared designation as the primary residential parent, with Father holding the designation during the summer when the legislature was no longer in session. The plan provided Father with 155 days of co-parenting time. He exercised visitation on a recurring two-week cycle when in Nashville. The cycle began in January and expired the Monday "following the completion of standardized testing, or until [Father] is out of session, [whichever] is later." The Parties shared equal co-parenting time on a biweekly schedule when the recurring two-week cycle expired. The Parties modified the plan throughout the pendency of this action. Despite the agreed plan and subsequent modifications, the relationship between the Parties was contentious and continued to deteriorate.

Thereafter, the court held a hearing on the motion to order a psychological examination and to disqualify counsel. The court required the Parties to each complete a psychological examination at Father's expense but held the motion to disqualify counsel in abeyance pending the results of the examinations. The court noted that it was "probably advisable for both sides for [Counsel] to remain in the case . . . through additional mediation [because disqualification] would prolong the matter."

On December 31, 2013, Mother filed a motion to alter or amend the parenting plan, alleging that Father failed to timely pay for replacement eyeglasses for the Child and failed to ensure the Child's attendance in a preschool program. A flurry of competing contempt motions followed.

---

[2] Counsel and Mother married during the pendency of the case.

On February 13, 2015, the court held a hearing on a number of pending motions, namely the motion to disqualify counsel and a motion to reconsider the need for psychological examinations. As pertinent to this appeal, the court denied the motion to disqualify counsel and reaffirmed its earlier ruling requiring the Parties to complete the examinations. The examinations revealed that Mother could benefit from "brief therapy" and that Father may benefit from family therapy, mental health treatment for symptoms of anxiety, and psychiatric consultation if his symptoms of anxiety persist or intensify.

At the hearing on Mother's motion to alter or amend the parenting plan, the court granted her request to orally amend her motion to include a petition to modify the parenting plan. Mother later filed an amended motion that included a petition in which she alleged that a material change in circumstances had occurred that necessitated a change in the residential parenting schedule. She alleged that Father failed to remit payment for medical and other expenses and that he refused to engage in healthy communication. She proposed a residential schedule that conformed to the Greeneville City School schedule and clarified the Parties' right to co-parenting time during the holidays. She also requested sole decision-making authority on a number of issues due to Father's refusal to communicate. Father objected to any change in the parenting schedule that did not afford him additional co-parenting time during the legislative session.

The case proceeded to a hearing, at which several witnesses testified. A number of Mother's friends testified as to her loving relationship with the Child and her exemplary parenting style. Additionally, several of these witnesses had accompanied Mother to exchange the Child with Father. These witnesses testified as to Father's odd behavior, namely he appeared to record Mother with his cellular telephone throughout the exchange.[3] One witness also testified that Father called Mother "evil" while in the presence of the Child.[4] Additionally, Crystal Carol Brown, Mother's relative, claimed that Father appeared as if he was recording her when she retrieved the Child in Mother's stead. Another witness testified that Father failed to acknowledge the Child while the Parties were present for a public event.[5]

Much of the remaining testimony presented concerned the Child's participation in various activities, namely a T-ball program at the Young Men's Christian Association ("the YMCA"), a T-ball program in Bull's Gap, a Mother's Day Out program ("MDO"), and a gymnastics program at Flip Zone. Danny Silvers, the Senior Program Director for the Greene County YMCA, testified by deposition concerning the Child's participation in the T-ball program at the YMCA. He recalled that Father initially expressed interest in

---

[3] Father denied excessively recording Mother. He explained that he was ready to film in the event that he felt documentation of his interaction was necessary given their prior physical altercation.

[4] Father denied calling Mother "evil."

[5] Father claimed that his attempt to acknowledge the Child was to no avail in the crowded event.

the program and volunteered to coach. Mother later volunteered to coach and attended the organizational meeting, where Father was also present. He claimed that Father refused to coach after he learned that Mother had volunteered. Thereafter, Father failed to respond to his repeated attempts to work with the Parties to find a solution. He acknowledged that Mother offered to step aside in an effort to placate Father. He claimed that the Child thrived in the T-ball program despite Father's absence.

Stephanie Tweed, Mother's friend and another assistant coach for the T-ball program at the YMCA, testified that the Child only participated while in Mother's care and that Father never attended a practice or game. She noted that Father's mother, Jeanette Hawk ("Grandmother"), lived across the street from the field. She provided that Mother remained involved when the Child missed practices and games while in Father's care. Ms. Brown, Mother's relative and another volunteer for the T-ball program, confirmed that the Child enjoyed Mother's involvement in the program.

Terry Tillery, the director of MDO, and Marlys Raider, an MDO employee, testified concerning the Child's involvement in MDO. They explained that MDO is essentially a day care and that regular attendance in the program is not mandatory. Ms. Raider provided that the Child was enrolled in her class on Tuesdays and Thursdays from 8 a.m. to 2:00 p.m. She, as well as Ms. Tillery, observed a loving relationship between the Child and both parents. They recalled that Father attended orientation with the Child but claimed that he arrived after the majority of the students and parents had left.

Ms. Brown testified that Mother attended the MDO orientation. She observed Father waiting in his car in a different parking lot while Mother attended the event.[6]

Bri Campbell, a Flip Zone employee, testified that the Child usually attended class each week on Wednesday at 6:30 p.m. Mother was often present for class to encourage the Child. She agreed that Father also attended the class on occasion. She recalled a specific occasion in which she observed Father pointing a camera at Mother during class.

Daughter testified by deposition[7] that she assisted Father in caring for the Child and had babysat her once. She claimed that the Child cried "all the time" and was upset by "a lot of things." She agreed that Father comforted the Child when necessary. She recalled that the Child had asked for Mother on occasion while in Father's care but admitted that the Child appeared to enjoy spending time with Father and did not want him to leave. She acknowledged that the Child often played outside with Father.

---

[6] Father explained that he did not immediately enter the building because the Child had just woken from a nap when they arrived.

[7] Daughter was 14 years old at the time of the deposition.

Father testified that he was employed by the State of Tennessee as a state representative for Greene County. His employment required his presence in Nashville when the legislature is in session from January through May or June. He also had different obligations a few days each month when the legislature is out of session. He claimed that he attended events and meetings throughout the year and is constantly campaigning because his position is subject to a two-year election cycle.

Father admitted that he did not take the Child to T-ball practice or games last season. He claimed that Mother expressed anger when he enrolled the Child in the program because he failed to gain her permission before enrolling her. He later chose not to participate in an effort to avoid conflict. He acknowledged that Mr. Silvers sought to work with them for the benefit of the Child. He appreciated the effort expended by Mr. Silvers but provided that he could not participate for fear of conflict with Mother. He also did not attend the Child's soccer practices or games in an effort to avoid conflict. He claimed that Mother later rebuffed his offer of compromise when he attempted to cooperate with her for the current T-ball season.

Father agreed that he and Mother were together on occasion, specifically when the Child attended class at Flip Zone. He explained that he took the Child to class during his co-parenting time and that Mother attended of her own volition. He felt that he could not ask her to leave the building. He agreed that he had taken the Child at a different time or day on occasion without informing Mother.

Father acknowledged that the Child's participation at Flip Zone and in MDO was anticipated in the parenting plan. He recalled only one or two occasions where he did not take the Child to MDO. He explained that he likely spent the day with the Child instead but agreed that he failed to inform Mother. He also agreed that he did not take the Child to birthday parties during his co-parenting time. He claimed that Mother scheduled activities during his co-parenting time in an effort to gain more time with the Child and to control his schedule. He asserted that he did not schedule events or activities for the Child during Mother's co-parenting time. He simply requested the same consideration.

Father testified as to his interactions with Mother when they exchanged the Child for co-parenting time. He refused to take the Child from Mother's arms because he did not want to engage in physical contact with her. He identified three recordings documenting his exchange of the Child. He related that they later reached an agreement in which the receiving parent would remain in the car while the Child was placed in the car seat. He claimed that the new arrangement proved unworkable. He noted that the maternal grandmother waited for him outside the car on one occasion and that Mother interfered with his attempt to place the Child in the car seat on another occasion.

Father agreed that he and Mother had trouble communicating. He acknowledged that he was required by order to respond to her emails within 48 hours. He denied receipt of several emails but explained that he received "hundreds of emails every day." He asserted that communicating with Mother was challenging when she insisted on his acquiescence to her excessive requests. He proposed assigning someone to mediate future disputes concerning the Child and to assist them in achieving healthy communication. He identified a plethora of emails between himself and Mother in which their inability to communicate in a healthy manner was evident.

Father requested an adjustment to the residential schedule to coordinate with the adjournment of the legislative session in Nashville. He noted that the current schedule only allowed for equal co-parenting time to start the Monday after the completion of standardized testing in the school system. He claimed that the arrangement caused confusion and resulted in his loss of a week of equal co-parenting time when the Child was not yet in school and required to complete standardized testing.[8]

Father testified that he attempted to remit payment for the Child's medical expenses. He explained that Mother had sought payment for her own medical bill at one point, prompting him to carefully evaluate each bill submitted by Mother. He provided that he kept copious documentation of the Child's expenses and that he was current with his financial responsibilities, despite Mother's claim to the contrary. He testified that the Child never went without glasses and that he simply advised Mother to wait to procure new glasses until his insurance began in January.

Father denied responsibility for the physical altercation that preceded the divorce and his reckless endangerment conviction. He also denied responsibility for his tense relationship with Mother and their failure to communicate.

Mother testified that she opened her own law practice in 2009 and that she also held a license as a real estate broker. She acknowledged that she had been publicly censured by the Tennessee Supreme Court in October 2014 for using improper methods to obtain evidence against her first husband in their divorce proceeding.

Mother testified that she initially sought to amend the parenting plan because Father failed to take the Child to MDO and because he refused to remit payment for the Child's glasses. Relative to MDO, she asserted that Father failed to take the Child on three occasions but admitted she could not recall the exact dates. She acknowledged that she was unsure as to whether Father failed to take the Child to MDO in the 30 days between the entry of the parenting plan and the filing of her motion to alter or amend the

---

[8] Suzanne Claiborne Bryant, the assistant director of schools for instruction at Greeneville City Schools, testified by deposition concerning the standardized testing schedule.

plan. Relative to his failure to remit payment for medical expenses, Mother acknowledged that Father's insurance policy would have covered the cost of glasses if she had waited 30 days to place the order. She explained that the Child could not wait for glasses because she suffered from a medical condition called amblyopia.

Mother testified that a number of changes had been made to the parenting plan since they reached an agreement. She provided that her proposed parenting plan included the changes and a few additional adjustments, namely she requested designation as the party responsible for decision-making. She explained that the current plan that allowed for joint decision-making was unworkable because of Father's refusal to communicate.

Mother next testified as to Father's refusal to communicate and his effort to either avoid her or film her in a public setting. She related that the Child had numerous medical appointments to treat her amblyopia. She asserted that the appointments were set around Father's schedule. She claimed that Father either failed to attend the appointments or engaged in odd behavior throughout the appointment, namely he filmed her instead of comforting the Child. She asserted that he also failed to attend the Child's yearly well-child appointment even though that appointment was set around his schedule.

Mother recalled that Father failed to respond to her invite to the orientation for MDO and that he sat in a parking lot until she left. She claimed that the Child was unable to meet the other children in the classroom because he waited for her to leave before entering the building. She asserted that Father took the Child to Flip Zone on a different day on at least two occasions without informing her. She explained that the Child expected her to attend the class and was likely confused by her absence. She claimed that Father often filmed her instead of watching the Child when they were both present at Flip Zone. She recalled that he refused to respond to her when she sought permission to enroll the Child in a T-ball program in Bulls Gap. She enrolled the Child anyway, but the Child was only able to participate while in her care. She recalled that Father also refused to attend the Child's soccer practices and games.

Relative to the T-ball program at the YMCA, Mother claimed that she offered to coach well before Father enrolled the Child in the program. She provided that he enrolled the Child without discussing the matter with her and then expressed frustration when she advised him that she also planned to volunteer. She stated that he refused to take the Child to practices or games, thereby only allowing the Child to participate while in her care. She noted that the field was across the street from Grandmother's house. She agreed that Father offered to cooperate with her for the current season but provided that his cooperation came with "certain conditions" that she did not want to meet.

Mother claimed that she could not co-parent with Father because he refused to communicate with her. She noted that he often failed to respond to her requests to reschedule co-parenting time even though she adjusted her schedule on at least two occasions for his benefit. She agreed that he allowed her to reschedule on one occasion but asserted that he requested additional time for his cooperation. She sought decision-making authority only for those occasions where he refused to respond to her with a definitive answer. She noted that he complied with the court's order to respond within 48 hours by simply stating that he would take her request under advisement.

Mother testified that Father had neglected the Child's hygiene on at least one occasion. She provided that the Child was returned with yogurt in her hair. She claimed that Father denied her accusation and called her a liar instead of working with her to resolve the issue. She also testified as to the Child's repeated requests to return home to her while in Father's care.

Mother objected to Father's request to begin equal co-parenting time when the legislature is out of session. She provided that the legislature adjourns at a different time each year depending upon that year's circumstances. She explained that she did not want to disrupt the Child's schedule once the Child is enrolled in school. She asserted that significant changes during the standardized testing period could be detrimental to the Child. She sought a parenting plan that provided for equal parenting time beginning the Monday following the last day of school and ending the Friday before the start of the school year. She agreed that her proposed parenting plan afforded her an additional eight days of co-parenting time. She also acknowledged that the court would have to adjust the schedule again if the Greeneville City Schools transitioned to a year-round schedule.

Mother acknowledged that her psychological examination revealed that she possessed an impulsive personality with narcissistic features and that her personality was also classified as histrionic. She agreed that she informed the examiner that Father hit her on one occasion and had been "found guilty" following trial. She acknowledged that Father had been found guilty of reckless endangerment, not assault. She explained that she simply failed to clarify the offense during her examination. She agreed that her examiner suggested that she might benefit from therapy. She asserted that Father's examiner suggested that he might benefit from psychiatric help.

Grandmother admitted that she did not attend any of the Child's T-ball games in an effort to avoid conflict with Mother. She provided that Mother did not make her feel welcome. She claimed that Mother refused her offer to teach the Child piano at her local

church on Wednesday mornings.[9]  She agreed that Father and the Child frequented her house during his co-parenting time.  She described a loving relationship between them.  She acknowledged that the Child was returned to Mother with messy hair once.  She explained that the Child "had been fidgety and did not want [her hair combed]" that day.

Citing Mother's public censure and Father's failure to acknowledge responsibility for his conviction of reckless endangerment, the court found that the Parties were not credible witnesses.  The court also found Mother's testimony unconvincing concerning Father's failure to remit payment for glasses and to ensure the Child's attendance at MDO.  Nevertheless, the court modified the plan "on the basis of the proven inability and/or unwillingness of the parties to effectively communicate and/or co-parent and in the best interest[] of the [C]hild."  As pertinent to this appeal, the modifications were as follows:

- Until [the Child] enters the first grade, equal parenting time shall begin at 8:00 a.m. on the Monday following the last day of the legislative session.

- Once [the Child] enters the first grade, equal parenting time shall begin at 8:00 a.m. on the Monday following the last day of school for the Greeneville City School System.

- In the event that [Father] no longer serves in the Tennessee General Assembly, equal parenting time shall be instituted year-round.

- Both parties shall attend psychological counseling as recommended by the psychologist who evaluated him/her and as recommended by the psychologist.

- The day count of parenting time shall remain the same as previously ordered.

- The order for support in this matter shall remain the same as previously ordered.

---

[9] Mother testified that she was unable to take the Child on Wednesday due to her court schedule.  She provided that she was willing to schedule lessons for another day and asserted that Grandmother had refused her request to start a music program in the past.

- The same parent who has taken [the Child] to healthcare providers in the past shall continue to do so in the future and the parent taking her to such appointments shall have sole decision making authority while she is in that parent's care unless the decision constitutes a major medical decision and is not an emergency.

- Both parties shall work together to facilitate [the Child's] participation in and enjoyment of extracurricular activities whether that be in sports, music, the arts, or some other activity. Each parent shall cooperate in ensuring that [the Child] attends activities in which she has been enrolled, including, those she was enrolled in by the other parent.

- Both parties shall complete the parenting classes.

- Both parties shall <u>fully</u> reply to communications sent by the other within 48 hours.

- In the event that the parties are unable to settle future co-parenting issues among themselves, they shall complete the parenting classes <u>again</u> and they shall complete mediation before filing any additional motions before the [c]ourt. If the parties are unable to agree on a mediator, the [c]ourt will appoint one.

- Since the psychological evaluations were very beneficial to the [c]ourt in this case and since [Father] paid for both, [Mother] shall reimburse [Father] the cost of her evaluation within 30 days of the entry of this order.

This timely appeal followed.

## II.    ISSUES

We consolidate and restate the issues raised on appeal by Mother as follows:

A.    Whether the court erred in modifying the parenting plan.

B.    Whether the court erred by failing to enter a parenting plan and child support worksheet.

C.    Whether the court erred by requiring the Parties to attend additional parenting classes and mediation before seeking further relief from the court.

D.    Whether the court erred by requiring Mother to reimburse Father for her psychological examination.

E.    Whether the court erred by requiring the Parties to undergo psychological counseling.

Father also raised an issue on appeal for our consideration that we restate as follows:

F.    Whether the court erred by refusing to disqualify Mother's counsel.


## III.    STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d).  The trial court's conclusions of law are subject to a de novo review with no presumption of correctness.  *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).  "A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013) (citing *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007)).

In matters of child custody, trial courts are vested with broad discretion, and appellate courts will not interfere with the trial court's decision except upon a showing of erroneous exercise of that discretion.  *See Whitaker v. Whitaker*, 957 S.W.2d 834, 836-37 (Tenn. Ct. App. 1997).  The Tennessee Supreme Court further explained the broad discretion afforded trial courts in such matters as follows:

Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. Thus, determining the details of parenting plans is peculiarly within the broad discretion of the trial judge. It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court. A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. A trial court abuses its discretion in establishing a residential parenting schedule only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.

*Armbrister*, 414 S.W.3d at 693 (internal citations omitted).

## IV. DISCUSSION

### A. & B.

Mother argues that the court erred by refusing to adopt her proposed parenting plan, specifically she requests a residential schedule that conforms to the Greeneville City School schedule and provides Father with adequate visitation. She also requests sole decision-making authority for issues pertaining to the Child's healthcare, extracurricular activities, religion, and education. She asserts that the court erroneously established an alternative schedule that provided for equal co-parenting time in the event that Father's employment responsibilities changed. She further claims that the court failed to make the appropriate findings in support of its decision and also failed to enter a permanent parenting plan with an attached child support worksheet. Father responds that the court did not err; however, he acknowledges that entry of a permanent parenting plan with a child support worksheet would be beneficial.

"A custody decision, once final, is res judicata upon the facts in existence or reasonably foreseeable when the decision was made." *Scofield v. Scofield*, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citing *Young v. Smith*, 246 S.W.2d 93, 95 (Tenn. 1952)). However, because the circumstances of children and parents change, our courts are "empowered to alter custody arrangements

when intervening circumstances require modifications." *Id.* at *2 (citing Tenn. Code Ann. § 36-6-101(a)(1)). Modification of an existing custody or visitation arrangement involves a two-step analysis. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). First, the parent attempting to modify the existing custody or visitation arrangement must prove that a material change in circumstances has occurred. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). "If a material change in circumstances has occurred, it must then be determined whether the modification is in the child's best interest[ ]." *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002) (footnote omitted).

The determination of whether a "material change in circumstance" occurred requires a different standard depending upon whether a parent is seeking to modify custody (i.e., change the primary residential parent) or modify the residential parenting schedule. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). A lower threshold is required for modification of a residential parenting schedule. *Scofield*, 2007 WL 624351, at *3. Tennessee Code Annotated section 36-6-101(a)(2)(C) provides, in pertinent part,

> If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

Here, the Parties agreed that they were unable to communicate in a healthy manner. The record confirms that the Parties were in constant disagreement and that Father simply refused to respond to Mother on occasion in an effort to avoid conflict. The record supports a finding that the pattern of conflict and failure to communicate affected the Child's well-being in a meaningful way and necessitated a change in the residential parenting schedule that was in the best interest of the Child. Accordingly, we affirm the court's decision that a material change in circumstances occurred.

Having concluded that a material change in circumstances occurred, this court must now consider whether the trial court erred in modifying the parenting plan. In modifying a residential parenting schedule, the trial court must determine whether a change in visitation is in the best interest of the child. *In re J.C.S.*, No. M2007-02049-

- 13 -

COA-R3-PT, 2008 WL 2924982, at *6 (Tenn. Ct. App. July 28, 2008). This determination requires consideration of a number of factors, including those set forth at Tennessee Code Annotated section 36-6-106(a) to make an initial custody determination and those at Tennessee Code Annotated section 36-6-404(b) to establish the schedule. *Id.*

We acknowledge that the record does not reflect that the trial court articulated each relevant factor and assigned weight to each factor. Such is not required. Trial courts are not required to articulate each and every fact and its application in custody cases. *See Murray v. Murray*, No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at *8 (Tenn. Ct. App. Sept. 28, 2010) (stating that "while the statute requires the trial court to consider all the applicable factors, there is no statutory requirement that the court list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination"). Additionally, the order contains findings "as to the reason and the facts that constitute the basis for the custody determination." Tenn. Code Ann. § 36-6-101(a)(2)(B)(i). The order also reflects the court's performance of the appropriate two-step analysis. *See Crafton v. Roberts*, No. W2015-00048-COA-R3, 2015 WL 9466011, *7-8 (Tenn. Ct. App. Dec. 28, 2015) (vacating the court's modification of a parenting plan due to a "lack of findings evidencing that the trial court performed the two-step analysis required for a custody modification").

Here, the court modified the plan "on the basis of the proven inability and/or unwillingness of the parties to effectively communicate and/or co-parent and in the best interest[] of the [C]hild." The Parties submitted exhaustive evidence of the other parent's shortcomings. Mother alleged that Father was vindictive and unresponsive, while Father alleged that Mother was controlling and manipulative. Notably, the court questioned each parent's credibility but ultimately found that the Parties loved the Child, despite their inability or unwillingness to cooperate with one another. The court then established a residential schedule that minimized the potential for conflict in the decision-making process, established equal co-parenting time when possible and in the best interest of the Child, and provided guidance for likely changes in the future.[10] With these considerations in mind and recognizing the court's broad discretion on this matter, we hold that the record supports the court's modifications. However, we agree that the court erred by failing to craft a permanent parenting plan and child support worksheet that incorporated its modifications. Tenn. Code Ann. § 36-6-404(a). We remand this case for entry of a permanent parenting plan and a child support worksheet.

---

[10] We note that Mother may file a new petition to modify the residential schedule in the event that the alternative residential schedule requiring year-round equal co-parenting time becomes applicable but is no longer in the best interest of the Child pursuant to Tennessee Code Annotated section 36-6-101(a)(2)(C).

C.

Mother argues that the trial court erred in ordering the Parties to attend parenting classes and mediation before seeking further relief from the court. Father responds that the court did not err.

Relative to mediation, Tennessee Code Annotated section 36-6-404(a)(4) provides, in pertinent part, that a permanent parenting plan must "[p]rovide for a process for dispute resolution" before either party may initiate future court action. The court did not err in ordering the Parties to submit to mediation before initiating court action.

Relative to parenting classes, Tennessee Code Annotated section 36-6-408(a) provides, in pertinent part, as follows:

> In an action where a permanent parenting plan is or will be entered, each parent shall attend a parent educational seminar as soon as possible *after* the filing of the complaint.

(Emphasis added). We agree that the statute permits successive attendance in cases where numerous parenting plans are entered. However, the statute does not require attendance *before* a party may seek relief from the court. Such a requirement unnecessarily hinders a party's access to justice. Accordingly, the court erred by requiring attendance in an education seminar *before* seeking further relief from the court.

D. & E.

Mother argues that the trial court erred by ordering her to remit payment for her psychological examination and by ordering her to comply with the recommendations contained in her psychological examination. She also opines that ordering her to submit to an examination was error. Father responds that the court did not err.

Rule 35.01 of the Tennessee Rules of Civil Procedure provides as follows:

> When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in his custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and

shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

In any proceeding involving the modification of a residential parenting schedule, the court must determine whether a material change of circumstance affecting the best interest of the child has occurred. Tenn. Code Ann. § 36-6-101(a)(2)(C). A party's mental or physical condition is necessarily at issue in a best interest analysis. Indeed, Tennessee Code Annotated section 36-6-106(8) provides, in pertinent part, as follows:

> [In conducting a best interest analysis, the court shall consider the] moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings[.]

With these considerations in mind, we conclude that the court did not err in ordering the Parties to submit to psychological examinations and in directing Mother to share in the cost of the examinations once it determined that the examinations were pertinent to its decision.

Relative to the requirement to undergo counseling as recommended by their individual examiners, we note that trial courts are afforded with broad discretion to fashion parenting plans that meet the needs of the child at issue and address the circumstances presented in each particular case. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing *Armbrister*, 414 S.W.3d at 693). Trial courts are also specifically tasked with fashioning parenting plans that "[m]inimize the child's exposure to harmful parental conflict." Tenn. Code Ann. § 36-6-404(a)(3). With these considerations in mind, we decline to disturb the court's discretion given the hostility between the Parties in this case and their inability to communicate.

## F.

Father argues that the trial court erred in denying his motion to recuse Counsel. Wife responds that this issue is waived because Father failed to timely appeal the denial of the motion, which was denied by a separate order entered before trial.

Rule 3 of the Tennessee Rules of Appellate Procedure provides, as follows:

(a) Availability of Appeal as of Right in Civil Actions. In civil actions every final judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Appeals is appealable as of right. Except as otherwise permitted in Rule 9 and in Rule 54.02 Tennessee Rules of Civil Procedure, if multiple parties or multiple claims for relief are involved in an action, *any order that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before entry of a final judgment adjudicating all the claims, rights, and liabilities of all parties*.

(Emphasis added). Here, the record reflects that the order denying the motion to disqualify is not a final order. The order disposed of approximately five pre-trial motions and further provided that "[a]ll other motions will be heard concerning the parenting plan, contempt motions and any other pending issues at the [April 2015] trial which is the final hearing in this matter." This issue is not waived. However, Father fails to establish how any error in denying the motion to disqualify "affected the judgment or . . . resulted in prejudice to the judicial process" when he does not object to the modifications ordered by the trial court. Tenn. R. App. 36(b).[11] Accordingly, we conclude that any error in denying the motion was harmless.

---

[11] A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process. When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.

## V. CONCLUSION

The judgment of the trial court is reversed, as to the requirement to attend a parent education seminar before seeking further relief from the court. The judgment of the trial court is affirmed in all other respects. The case is remanded for entry of a permanent parenting plan and child support worksheet and for such further proceedings as may be necessary. Costs of the appeal are taxed one-half to the appellant, Crystal Goan Hawk, and one-half to the appellee, David Bryan Hawk.

_____
JOHN W. McCLARTY, JUDGE